IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY KAY NELSON , | ) | CASE NO. 5:16CV2464 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Kimberly Kay Nelson ("Nelson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

On April 4, 2013, Nelson filed an application for DIB, alleging a disability onset date of August 14, 2007.  Tr. 126.  She alleged disability based on the following: overactive immune system, psoriasis and arthritis in her hands and feet, depression, anxiety, and fibromyalgia.  Tr. 154.  After denials by the state agency initially (Tr. 64) and on reconsideration (Tr. 75), Nelson requested an administrative hearing.  Tr. 83.  A hearing was held before Administrative Law Judge ("ALJ") Thomas A. Ciccolini on August 3, 2015.  Tr. 22-54.  In his August 20, 2015,

decision (Tr. 11-17), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Nelson can perform, i.e., she is not disabled.  Tr. 16.  Nelson requested review of the ALJ's decision by the Appeals Council (Tr. 6) and, on August 6, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Nelson was born in 1963 and was 49 years old on the date her application was filed.  Tr. 126.  She previously worked as a mail carrier, post office clerk, and personnel clerk.  Tr. 37-38.  She has a two-year associate degree in applied business.  Tr. 26.

### B.  Relevant Medical Evidence

Nelson was diagnosed with sarcoidosis in 1992.[1]  Tr. 219.  In 1995, she had a mild exacerbation of extrapulmonary sarcoid symptomology including multiple bilateral joint pain, chest pain, and shortness of breath.  Tr. 217-219.  She reported significant, but not complete, improvement in her symptoms following two weeks of low dose prednisone therapy.  Tr. 217, 220.  The recommended plan was for Nelson to be treated on a symptomatic basis with the same low dose prednisone therapy.  Tr. 217.

On March 15, 2007, Nelson saw Christ J. Ticoras, M.D., with complaints of fingernail abnormalities that had gotten worse over the last few years, blistering of her fingers, and numerous lesions and a rash on her face.  Tr. 239.  She reported that she had been diagnosed with sarcoidosis but was not being actively treated with steroids.  Tr. 239.  Upon examination, she had two .3 centimeter flesh-colored papules on her right cheek, some acneiform lesions on her

---

[1]  Sarcoidosis is "a chronic, progressive, systemic granulomatous reticulosis of unknown etiology, characterized by hard tubercles" and "can affect almost any organ or tissue."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1669.

forehead, cheeks and chin, some mini pustules of her fingertips on eight out of ten fingers and abnormalities of the same nail plates.  Tr. 239.  She had no other suspicious lesions elsewhere on her body.  Tr. 239.  Dr. Ticoras prescribed medicated cream for her acne, Prednisone and medicated cream for her hands, and provided information on dry skin care.  Tr. 239.  He assessed Nelson with palmar-plantar pustulosis with nail involvement, acne rosacea flaring, and benign nevus of the right cheek.  Tr. 239.

On May 2, 2007, Nelson went to Loudonville Family Health ("Loudonville") complaining of chest pains.  Tr. 240.  She was advised to go to the emergency room to rule out cardiac possibilities.  Tr. 240.  She returned to Loudonville for a follow-up visit on July 12, reporting that she was told at the ER that she had had stress related chest pain.  Tr. 240.  She reported working 50-55 hours a week and the note reads that she was "off work" July 12 and July 13 for illness.  Tr. 240.  Tr. 240.  She reported a history of anxiety, depression and chest pain.  Tr. 240.  Upon exam, she had thin, dry, scaly palms and warm hands.  Tr. 240.  She was assessed with chest pain, anxiety and depression and was prescribed Celexa and Lorazepam.  Tr. 240.

Six days later Nelson returned to Loudonville and complained of costochondritis (chest wall pain), aching all over due to fibromyalgia, anxiety, and job stress.  Tr. 242.  Upon exam, she had multiple myofascial triggers.  Tr. 242.  She was assessed with fibromyalgia, chronic pain and chest wall pain, was prescribed a muscle relaxant, and was noted to be "off work" July 18 to July 31 for illness and treatment.  Tr. 242.

The next month Nelson returned to Loudonville with "lots of problems with stress" and no menstrual period for five months.  Tr. 243.  At a follow-up appointment on August 28, 2007, she reported that she was tired but her fibromyalgia symptoms were much improved with medication.  Tr. 244.

On June 30, 2009, Nelson saw Catherine Y. Taras, M.D., to establish care and get medication refills.  Tr. 298, 304.  She reported having recently moved to the area with her boyfriend and she was currently doing household duties.  Tr. 298.  She reported a history of depression, acne, sarcoidosis in remission, and fibromyalgia.  Tr. 298.  She worked as a self-employed artist.  Tr. 298.  She stated that she was fairly active and had no other physical complaints, including denying chest pain and shortness of breath.  Tr. 298.  Dr. Taras assessed acne, menopause, depression, and anxiety.  Tr. 298.

On August 25, 2009, Nelson returned to Dr. Taras complaining of a vaginal infection, right hand numbness, and right hip and knee pain.  Tr. 300.  Upon exam, she had a positive Tinel's sign in her right hand.  Tr. 300.  Dr. Taras assessed her with carpal tunnel syndrome and recommended she take ibuprofen for aches and pain.  Tr. 300.

On January 19, 2010, Nelson returned to Dr. Taras for medication refills.  Tr. 301.  She told Dr. Taras that she felt relatively stable on her current Zoloft dosage.  Tr. 301.  She reported that she continued to watch the children of her live-in boyfriend on a daily basis.  Tr. 301.  She occasionally used Lorazepam (once, maybe twice a week).  Tr. 301.  She denied any complaints of chest pain, shortness of breath, dizziness, or lightheadedness.  Tr. 301.  She advised that she had been seeing a chiropractor for low back discomfort and requested a muscle relaxant to use at night.  Tr. 301.  Upon exam, Nelson had some mild paraspinal tenderness on palpation but she was able to flex, extend, and laterally rotate without much limitation.  Tr. 302.  Dr. Taras prescribed Flexeril for her back pain.  Tr. 302.

On March 23, 2010, Nelson saw Dr. Taras complaining of an upper respiratory infection, a rash on her right breast, and right leg sciatica.  Tr. 303.

On July 26, 2010, Nelson returned to Dr. Taras for a follow-up visit with complaints of fatigue and not feeling well.  Tr. 304.  Since running out of her Zoloft, she had noticed increased aches and pains.  Tr. 304.  She also reported lead exposure due to her craft of stained glass making and she requested blood work.  Tr. 304.  She denied chest pain and shortness of breath and was using her Lorazepam "on a very as needed basis."  Tr. 304.  Dr. Taras assessed Nelson with depression, fibromyalgia, and menopausal symptoms and recommended holding off on inflammatory studies until she resumed taking her Zoloft.  Tr. 304.

On January 20, 2011, Nelson saw Dr. Taras for treatment of a vaginal infection.  Tr. 306-307.  She received medication for treatment of her infection as well as Estradiol, Zoloft, and Wellbutrin.  Tr. 307.

On August 23, 2011, Nelson returned for a follow up visit and medication refills.  Tr. 309.  She complained of fatigue, fever, joint pain, myalgia (neck, upper back), night sweats, insomnia, trigger point tenderness, and weight gain.  Tr. 309.  Her depression was stable.  Tr. 309.  She reported an occupational hazard of lead exposure in her work with stained glass.  Tr. 309.  She complained of shortness of breath and that she was trying to cut down on her smoking; she was currently smoking a half to one pack per day and had been smoking for 25 years.  Tr. 309.  She also had had mild to moderate papules on her hands and face for more than two years.  Tr. 309.  Upon exam, Nelson had mild acne on her face and hands, normal respiration, and a normal range of motion in all joints.  Tr. 309-310.  Dr. Taras prescribed medication to help her stop smoking.  Tr. 310.

Nelson missed two appointments in September 2011 with Dr. Taras and returned on October 20, 2011, for a routine physical.  Tr. 312-316.  She denied fatigue, weight gain, shortness of breath and chest pain.  Tr. 314.  She complained of anxiety and depression.  Tr. 314.

Upon exam, her findings were unremarkable.  Tr. 315.  Dr. Taras switched Nelson from Zoloft to Effexor and referred her to a rheumatologist for evaluation of her fibromyalgia symptoms.  Tr. 316.

On January 5, 2012, Nelson returned to Dr. Taras for medication refills.  Tr. 318.  She reported improving anxiety and depression, stable stressors, and significant benefit from the Effexor.  Tr. 318.  She was generally able to do her usual activities.  Tr. 318.  Her examination findings were normal.  Tr. 318.

On March 8, 2012, Nelson visited Amber D. Blair, M.D., at New Horizons Dermatology, complaining of psoriatic-arthritis on her hands and feet.  Tr. 248-250.  She reported taking Aleve for her arthritis and had used topical medication in the past for psoriasis, but she was not taking anything at that time and stated that she "has 'lived with it.'"  Tr. 248.  She had no other skin complaints.  Tr. 248.  Upon exam, she had pustular blisters on her upper and lower extremities and enlarged pores and scarring on her head/face.  Tr. 248.  Dr. Blair discussed psoriasis and acne treatment and prescribed Taclonex to apply to her hands and feet once a day.  Tr. 249-250.

On April 6, 2012, Nelson visited a podiatrist at Northeast Ohio Foot and Ankle with complaints of a moderately painful area on the back of her feet.  Tr. 252, 255.  It had been hurting for two years.  Tr. 255.  It hurt with pressure and with shoes, with extended activity, and first thing in the morning.  Tr. 255.  "Resting in the area appears to help."  Tr. 255.  Nelson also complained of pain on the bottoms of her feet, especially first thing in the morning, that she had experienced for about two-three months.  Tr. 255.  She believed that she had psoriatic arthritis.  Tr. 255.  She stated that she had just been trying over-the-counter anti-inflammatories without relief but that she had an appointment with a rheumatologist in a few months.  Tr. 255.  Upon exam, she had a large erythematous raised plaque on the plantar arch area of her right foot that

was consistent with a psoriasis type skin condition and no open lesions.  Tr. 256.  She had 4/5 strength in her lower extremities, a limited range of motion in her ankles, and tenderness to palpation in her heels.  Tr. 256.  She was diagnosed with Achilles tendonitis and received an injection in her heels and stretching exercises.  Tr. 257.  She was to return in three weeks and, at that time, the podiatrist would consider a possible MRI and/or physical therapy.  Tr. 257.  Nelson did not return and the podiatrist declined to complete a questionnaire from the state agency.  Tr. 252.

On May 29, 2012, Nelson saw rheumatologist Rochelle Rosian, M.D.  Tr. 270.  Nelson stated that she wondered if she had some kind of arthritis or psoriatic arthritis.  Tr. 270.  She reported that she had at least three episodes of sarcoidosis adenopathy since 1994 (ankle swelling treated with steroids), but it had been in remission since then.  Tr. 270.  She had been off work for the past four years.  Tr. 270.  She explained that her problems began in her fingertips and nails in the "early late 1990s" and she was diagnosed with pustular psoriasis.  Tr. 270.  She was currently taking anxiety and depression medication and a daily multivitamin.  Tr. 271.  She reported morning stiffness, low energy, a rash on her fingers and palms, psoriasis, scalp tenderness, paresthesia, weakness in her elbows, wrists and ankles, swelling in her fingers, feet and ankles, tenderness in her knees, and shortness of breath.  Tr. 271.  She had pain in her feet that got worse throughout the day.  Tr. 274.  She stated that she needed help with some daily tasks, that it was hard to stand in the shower, and that her hands were bothered by warm water.  Tr. 274.  Upon exam, she had no edema and normal pulses in her extremities.  Tr. 271.  She had no elbow or knee pain or swelling, minimal wrist bursitis and tenderness, pain in her left hip, minimal bilateral swelling in her metacarpophalangeal joints and a nodule over her flexor tendon, and bilateral pain and swelling in her interphalangeal joints with peeling skin and

swollen fingertips.  Tr. 71.  The skin on her fingertips had scales and peeling and nail changes (pitting, lifting and "oil spot") were suggestive of psoriasis.  Tr. 272.  She had no suspicious rashes or lesions, although she had a large patch of pustular psoriasis over her right mid-foot.  Tr. 272.  X-rays of her hands were unremarkable.  Tr. 277.  Dr. Rosian assessed pustular psoriasis of the palms and soles, polyarthritis, and plantar fasciitis and ordered additional workup.  Tr. 272-273.  She prescribed methotrexate (used to treat psoriasis and rheumatoid arthritis), omega-3 capsules, folic acid tablets, and foot exercises.  Tr. 273.

On October 9, 2012, Nelson had a follow up visit with Dr. Rosian.  Tr. 266.  She reported doing well on methotrexate.  Tr. 266.  She was still off work and stated that she took care of three children, ages 8, 10, and 12.  Tr. 266.  She complained that her hands itched, she was having flares once a month or so, and her foot was "flaring too."  Tr. 266.  Her physical exam findings were unchanged from her last visit.  Tr. 267-268.  She also appeared to have distal interphalangeal enlargement.  Tr. 268.  Dr. Rosian prescribed a topical ointment and a vitamin B complex.  Tr. 269.  Dr. Rosian was asked to complete a questionnaire from the state agency regarding Nelson's impairments but she did not do so and did not comment.  Tr. 260-262.

On April 9, 2013, Nelson returned to Dr. Taras for medication refills.  Tr. 320.  She reported worsening anxiety, decreased energy, and psoriasis plaques on her right foot that she had had for about a year.  Tr. 320.  Her depression was improving.  Tr. 320.  Upon exam, she had psoriasis, no edema, and a normal range of motion in all joints.  Tr. 320-321.  Dr. Taras prescribed Desoximetasone ointment for psoriasis. Tr. 321, 331.

On September 2, 2014, Nelson saw Johnny G. Su, M.D. as a new psoriatic arthritis patient.  Tr. 350.  She reported a history of psoriasis starting in the mid 1990's, fibromyalgia in the mid-late 1990's, and arthralgias starting in 2011.  Tr. 350.  She complained of early morning

stiffness (improving after 60 minutes but lasting all day), swelling in her ankles and toes, and pain in her fingers, wrists, knees, ankles, and toes.  Tr. 350.  On the day of her visit, her pain was mild.  Tr. 351.  As chronic fatigue and fibromyalgia symptoms, Nelson reported increased noise sensitivity, widespread pain in the past but not currently, chronic fatigue (level 4 out of 10) since 2011, depression that was well controlled, mild anxiety with anxiety attacks occurring twice a year, difficulty sleeping (waking unrefreshed), and diffuse myalgia "only 5 days per month."  Tr. 351.  At the appointment with Dr. Su, Nelson denied insomnia, sleep disturbances, anxiety, stress, depression, scalp tenderness, rashes, ulcers, skin tightness, psoriasis, shortness of breath, and limb weakness.  Tr. 352.  She endorsed having non-exertional chest pain, easy bruising and bleeding, intermittent numbness from her elbow to wrist, and constant numbness in her hands (from wrists to fingertips), left worse than right.  Tr. 352.  She reported taking over-the-counter Aleve as necessary (about 4 days per week) and that she had stopped taking her methotrexate.  Tr. 350.  Upon exam, she had psoriasis on her feet bilaterally and on the sole of her right foot.  Tr. 353.  She had no synovitis in her fingers, wrists, or elbows and had good range of motion in all.  Tr. 353.  She had a minimally decreased range of motion in her shoulders with no tenderness, mildly decreased range of motion in her hips with no tenderness, no tenderness in her ankles, a mildly decreased range of motion in her knees, no spine or sacroiliac tenderness, a minimally decreased range of motion in her cervical spine, and myalgias upon palpation of the proximal muscle groups in her upper extremities but none in her lower extremities.  Tr. 353.  She had a positive finding in 11 out of 18 trigger points.  Tr. 353.  Dr. Su's impression was polyarthritis, puslular psoriasis of palms and soles, sarcoidosis, and a vitamin D deficiency.  Tr. 354.  Dr. Su started Nelson back on methotrexate and folic acid tablets and advised that she continue to take over-the-counter Aleve as necessary.  Tr. 354, 356.

On June 10, 2015, Nelson saw Dr. Rosian for a routine psoriatic arthritis visit.  Tr. 440.  She had stopped taking methotrexate in March 2015 because of gastrointestinal symptoms.  Tr. 440.  She reported a new flare-up in her right ankle that was red, warm, swollen and tender.  Tr. 440.  She also complained of morning stiffness lasting one hour, fatigue beginning at 2:00 to 3:00 p.m., a rash, and psoriasis.  Tr. 440.  She denied problems with sleep.  Tr. 440.  Upon exam, she had psoriasis on her right foot, swelling in her hands and fingers bilaterally and peeling skin on her fingertips.  Tr. 441.  Dr. Rosian stated that Nelson "needs to get back on the methotrexate" and restarted her on that.  Tr. 441.  She also advised Nelson to see her dermatologist again "to get the skin better so we can look into [H]umira."  Tr. 442.

### C. Function report

On May 22, 2013, Nelson completed a handwritten Function Report in connection with her application for disability benefits.  Tr. 172-179.  She stated that she had difficulty writing and walking due to open sores, inflammation and arthritis.  Tr. 172.  She can't write, type or drive for long periods because her hands go numb.  Tr. 172.  She "tr[ied] to keep up with the house, picking up, laundry and cooking if I am able."  Tr. 172-173.  She took it slowly and napped frequently.  Tr. 173.  She cared for her family (husband, three stepchildren) and her pets.  Tr. 173.  She had difficulty with self-care (doing her hair, shaving, feeding herself) because her hands would fall asleep.  Tr. 173.  She could drive and go out but not for long periods.  Tr. 175.  She reported problems lifting, squatting, bending, standing, walking, kneeling, climbing stairs, completing tasks, concentrating, and using her hands due to her inability to put pressure on her feet or hands, open sores, inflammation and arthritis.  Tr. 177.  Depending on the terrain, she could walk about 20 feet then would need to rest for five minutes.  Tr. 177.  She reported that her medication side effects included feeling tired from methotrexate and a lack of sexual libido from

10

Effexor.  Tr. 179.  She could sometimes do things, but it was "becoming less & less"; she previously "pushed through these conditions" but now she was unable to do so.  Tr. 179.

### D. Medical Opinion Evidence—state agency reviewing physicians

On September 11, 2013, Anahi Ortiz, M.D., reviewed Nelson's record.  Tr. 60-62. Regarding Nelson's residual functional capacity ("RFC"), Dr. Ortiz opined that, from January 1 to December 31, 2012, Nelson could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, push/pull in both arms occasionally due to polyarthritis, occasionally crawl and climb ramps/stairs, never climb ladders/ropes/scaffolds, frequently balance, stoop, kneel, and crouch, must avoid concentrated exposure to hazards such as machinery and heights, and occasionally finger bilaterally due to polyarthritis with finger swelling.  Tr. 60-62.  Dr. Ortiz explained that there was insufficient evidence of Nelson's limitations prior to January 2012 and that the signs and symptoms in the record from March and May 2012 could be extrapolated to the beginning of the year.  Tr. 62.

On January 28, 2014, Frank Stroebel, M.D., reviewed Nelson's medical records and affirmed Dr. Ortiz's opinion. Tr. 70-72.

### E.  Testimonial Evidence

#### 1.  Nelson's Testimony

Nelson was represented by counsel and testified at the administrative hearing.  Tr. 25-47. Since 2008, she has been married and stays at home with her three step-children, who are all under the age of 18.  Tr. 26-27.  She stopped working as a personnel clerk for a plumbing company because she was calling off work too much with flu-like symptoms, described as not being able to do anything but sleep due to joint pain.  Tr. 31, 38.  These symptoms stem from her

sarcoidosis, which she was diagnosed with in 1992. Tr. 38. She estimates that she was absent from work about three days per month. Tr. 39. She had an agreement with her employer that she would quit, rather than be terminated, and therefore be eligible for unemployment benefits and her resume would look better to future potential employers. Tr. 31. Additionally, she stated that she had difficulty performing the job functions at work because of psoriasis on her hands. Tr. 39. Her hands crack open, become raw and painful, and she cannot type. Tr. 39.

After she separated from her last place of employment, she supported herself by making stained glass artwork. Tr. 32. She would try to go to craft shows, helping an older couple who also made and sold stained glass art. Tr. 33. To make stained glass she used a soldering iron, but she cannot use a soldering iron anymore to make stained glass because she doesn't have the strength and it causes her too much pain. Tr. 33.

She is able to drive, but somedays she is not able to drive. Tr. 27, 34. She can cook some. Tr. 34. Two of her step-children are daughters and she teaches them how to do laundry, cook, and wash dishes properly. Tr. 34. Her family has four dogs and she feeds them and gives them medication. Tr. 34. She can't do one thing for very long. Tr. 34. She is so exhausted that she could sleep constantly, but she tries not to and only does so when she is in very bad shape. Tr. 34. She has a friend who makes stained glass and occasionally Nelson will go to craft shows with her. Tr. 35. She has depression and takes medication that helps her. Tr. 46. She does a lot of studying on the health-related issues she has and is "constantly trying to find something to help me to make me feel better." Tr. 35.

Nelson testified that she is unable to work because "everything that I've looked at wants consistent" and she doesn't know when she is going to have a "down spell" or a good spell. Tr. 35-36. At least seven days a month she is bedridden. Tr. 36. Her psoriasis is getting worse the

12

older she gets.  Tr. 39.  In December 2011, she started to develop it on her right foot.  Tr. 39.

"Most of the time I can't get a shoe on my foot."  Tr. 39.  She started seeing rheumatologist Dr.

Rosian in 2012, because once the psoriasis in her foot started she thought that she had to find the

best doctor she could to see what could be done.  Tr. 39-40.  Her psoriasis is "constantly bad,"

but she had times when it is not as bad as other times.  Tr. 40.  At the hearing, she "really only

[has] one sore spot on my foot" and her hands were "probably the best you'll ever see them."  Tr.

40.  She still has raw spots on her fingertips and she "probably [is] going to end up losing my

nails."  Tr. 40.  She lets her nails grow long to protect her fingertips.  Tr. 40.  Even though her

hands were good on the day of the hearing, she still can't open a water bottle that has not been

opened initially.  Tr. 41.  Once a water bottle is initially opened, she is able to take the cap off.

Tr. 41.

        Nelson described a psoriasis flare up on her hands.  Tr. 41.  It starts with little blisters or

pus-filled sacs, the skin then dies off, and she will end up with raw, split areas on her fingertips.

Tr. 41.  For treatment she gets weekly methotrexate injections.  Tr. 42.  She has had these

injections since May 2012.  Tr. 42.  She does not know what causes a flare up or when one is

coming.  Tr. 42.  It gets worse when she uses her hands; for example, she will have her kids fold

the laundry because the material rubbing against her fingertips "just kills me."  Tr. 42.  It makes

her fingertips raw because the skin is dead and peeling and anything that she does to rub the dead

skin off leaves it raw.  Tr. 42.  Flare ups are constant.  Tr. 43.  The day of the hearing was rare

[because her symptoms were relatively benign].  Tr. 43.  She doesn't have any days in a month

when she could be normal.  Tr. 43.  She experienced these symptoms in 2012 when she was

seeing Dr. Rosian.  Tr. 43.

Nelson also has a history of fibromyalgia treatment since about 1995.  Tr. 43.  She is not able to distinguish her fibromyalgia symptoms from her sarcoidosis symptoms.  Tr. 43.  If her husband touches every fibromyalgia trigger point on her body it aches and "can just make you scream or yelp."  Tr. 43.  Her understanding is that the sarcoidosis is more organs and the fibromyalgia is more muscles, tendons and chronic fatigue.  Tr. 43.  Her fatigue was worse in 2012 and she experiences it about a minimum of seven days a month.  Tr. 44.  She was also diagnosed with polyarthritis.  Tr. 44.  She has difficulty using her hands "during [] breakouts" and she believes that she has lost a lot of nerve sensation in her foot and fingers.  Tr. 44.  She can't hold a needle and know that she is holding a needle.  Tr. 44.

In her everyday life, Nelson is able to use a computer but "it's nothing consistent."  Tr. 45.  When asked if she could perform work such as telemarketing, Nelson stated that she has considered that type of work but reiterated that "everything wants you on a time schedule and I don't know when I'm going to have" a problem.  Tr. 45.  The ALJ observed that the record showed that she stopped working because a previous marriage ended and she got remarried to a man with three young children.  Tr. 46.  Nelson responded, "Okay.  And because of my sick leave ..."  Tr. 46.  The ALJ commented that there is nothing in the record about sick leave, about being treated and a record supporting that Nelson should be off work due to her condition.  Tr. 46.  The ALJ asked Nelson if she had other records that the ALJ did not perhaps have.  Tr. 46.  Nelson stated that she had gotten slips from Dr. Bowman, a doctor she was seeing from June 2006 to August 2007.  Tr. 47.  The ALJ noted that he did have records from Dr. Bowman during that time period.  Tr. 47.  He asked if Nelson had seen him in the last year but Nelson had not seen Dr. Bowman since August 2007.  Tr. 47.  She stated that she switched doctors when she

moved and was not working after that time, so she would not have anything from a doctor writing her off work.  Tr. 47.

### 2.  Vocational Expert's Testimony

Vocational Expert Bruce Holderead ("VE") testified at the hearing.  Tr. 36-38, 48-54. The ALJ discussed with the VE Nelson's past work as a mail carrier, post office clerk, and personnel clerk.  Tr. 36-38.  The ALJ asked the VE to determine whether a hypothetical individual of Nelson's age and education could perform the work she performed in the past if that person could perform a full range of sedentary work.  Tr. 48.  The VE answered that such an individual could perform Nelson's past work as a personnel clerk.  Tr. 48.

Next, Nelson's attorney asked the VE whether the individual described in the ALJ's hypothetical could perform the job personnel clerk if that individual would miss work three days a month, and the VE replied that there would be no work such an individual could perform.  Tr. 49-50.  Nelson's attorney asked the VE to consider whether the following hypothetical individual of Nelson's age, education and work experience could perform Nelson's past relevant work if that person could perform light work but had the following limitations: can occasionally push and pull with both upper extremities; occasionally climb ramps, stairs and occasionally crawl; never climb ropes, ladders or scaffolds; could frequently balance, stoop, kneel, or crouch; can occasionally perform bilateral fingering; and must avoid all exposure to hazards.  Tr. 50.  The VE answered that such an individual could not perform any of Nelson's past relevant work.  Tr. 50.  Nelson's attorney asked whether such an individual could perform any other work and the VE stated that the individual could perform the following jobs: cleaner, housekeeper (500,000 national jobs); sales attendant (400,000 national jobs); and router (70,000 national jobs).  Tr. 51.

Nelson's attorney asked the VE if the ALJ's first hypothetical individual could perform Nelson's past relevant work if the individual was also limited to unskilled work.  Tr. 52.  The VE answered that such an individual could not perform Nelson's past relevant work.  Tr. 52.  The ALJ asked the VE to consider whether the following hypothetical individual of Nelson's age and education could perform any work if that person had the following characteristics: can lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally, must avoid unprotected heights, can perform skilled to semi-skilled work (ranged 1-4), and would benefit from an occasional sit/stand option which would be limited to three to five minutes at a time.  Tr. 53.  The VE answered that there would be a number of jobs that such an individual could perform.  Tr. 53.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.     If claimant is not doing substantial gainful activity, his impairment must
       be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a
       severe impairment that has lasted or is expected to last for a continuous
       period of at least twelve months, and his impairment meets or equals a
       listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ
       must assess the claimant's residual functional capacity and use it to
       determine if claimant's impairment prevents him from doing past relevant
       work.  If claimant's impairment does not prevent him from doing his past
       relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if,
       based on his vocational factors and residual functional capacity, he is
       capable of performing other work that exists in significant numbers in the
       national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his August 20, 2015, decision, the ALJ made the following findings:

1.     The claimant last met the insured status requirements of the Social
       Security Act on December 31, 2012.  Tr. 13.

2.     The claimant did not engage in substantial gainful activity during the
       period from her alleged onset date of August 15, 2007 through her date
       last insured of December 31, 2012.  Tr. 13.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.      Through the date last insured, the claimant had the following severe
        impairment: sarcoidosis/overactive immune system.  Tr. 13.

4.      Through the date last insured, the claimant did not have an impairment or
        combination of impairments that met or medically equaled the severity of
        one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
        Tr. 14.

5.      Through the date last insured, the claimant had the residual functional
        capacity to perform the full range of sedentary work as defined in 20
        CFR 404.1567(a).  Tr. 15.

6.      Through the date last insured, the claimant was capable of performing
        past relevant work as a personnel clerk, DOT 209.362-026, semi-skilled,
        SVP 4, sedentary.  This work did not require the performance of work-
        related activities precluded by the claimant's residual functional capacity.
        Tr. 16.

7.      The claimant was not under a disability, as defined in the Social Security
        Act, at any time from August 15, 2007, the alleged onset date, through
        December 31, 2012, the date last insured.  Tr. 17.

## V. Parties' Arguments

Nelson objects to the ALJ's decision on one ground: the ALJ's RFC is not supported by

substantial evidence because it does not properly account for all Nelson's functional limitations

and does not contain a function-by-function assessment.  Doc. 14, p. 7.  In response, the

Commissioner submits that the ALJ's decision is supported by substantial evidence.  Doc. 16, p.

12.

## VI. Law

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### VII. The ALJ's RFC is supported by substantial evidence

Nelson argues that the ALJ's RFC is not supported by substantial evidence because it does not "properly account" for all Nelson's functional impairments or contain a "function-by-function" analysis. Doc. 14, p. 7. Specifically, Nelson contends that the only medical opinions in the record—state agency reviewing physicians Ortiz and Stroebel—opined that Nelson could perform light work but had postural, environmental and manipulative limitations. Doc. 14, p. 8. She submits that the ALJ's RFC limited her to sedentary work but did not include the manipulative, environmental and postural limitations assessed by Drs. Ortiz and Stroebel. Id. Defendant asserts that the ALJ is not required to explain all reasons for rejecting the opinions of state agency reviewing physicians and that, regardless, the ALJ's decision sufficiently explains why the ALJ did not assess further limitations in his RFC assessment. Doc. 16, p. 13-15.

In his decision, the ALJ remarked that there was no treating source that offered an opinion as to Nelson's disability. Tr. 16. He gave "some weight" to the only opinion evidence in the record, that of the state agency reviewing physicians Drs. Ortiz and Stroebel. Tr. 16. Drs. Ortiz and Stroebel are not treating physicians. Thus, their opinions are not entitled to controlling weight and the ALJ was not required to give "good reasons" for discounting their opinions. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Moreover, the postural and environmental limitations assessed by the state agency reviewing physicians are not inconsistent with the ALJ's RFC assessment.  Drs. Ortiz and Stroebel limited Nelson to light work (standing and walking 6 hours a day), with occasional and frequent postural limitations, an environmental hazard restriction to avoid concentrated exposure to machinery and heights, and an occasional fingering limitation.  The ALJ limited Nelson to sedentary work, which does not require postural activities other than occasional stooping.  *See* 20 C.F.R. § 404.1567(a) (defining sedentary work); SSR 83-10, 1983 WL 31251, at *5 (defining sedentary work); SSR 85-15, WL 56857, at *7 (postural limitations such as kneeling, crouching and crawling not required in sedentary work.  "If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact.").  Drs. Ortiz and Stroebel found that Nelson could frequently stoop, and Nelson does not identify evidence to the contrary.  Thus, there is no evidence, including opinion evidence, that Nelson cannot occasionally stoop, the only postural requirement for sedentary work.

Regarding the environmental restriction included by Drs. Ortiz and Stroebel, i.e., that Nelson avoid concentrated exposure to machinery and heights, sedentary work does not generally require exposure to machinery and heights.  SSR 96-9p, 1996 WL 374185, at *9 ("In general, few occupations in the unskilled sedentary occupational base require work in environments with ... unusual hazards [such as moving machinery and heights]."  The past relevant work identified by the VE here—personnel clerk—is no exception.  See Doc. 14-1 (Dictionary of Occupational Titles listing environmental conditions for personnel clerk: none, other than noise).

Sedentary work does require bilateral manual dexterity.  *Id*. at *8.  The ALJ did not include an occasional bilateral fingering limitation, assessed by the state agency reviewing physicians, in his RFC assessment.  However, the ALJ explained in his decision why he did not find Nelson to be as limited by her impairments as she alleged.  The ALJ reiterated that the time period at issue is Nelson's alleged onset date, August 2007, through her date last insured, December 31, 2012.  Tr. 15.  He stated that the severity and frequency of symptoms alleged by Nelson during this time period are not supported by the record.  Tr. 15.  He acknowledged that she had mild to moderate papules on her hands and face and was treated with topical cream for psoriasis.  Tr. 15.  But her treatment records are sporadic and, thus, did not support the alleged frequency of her symptoms.  Tr. 15.  She had taken courses of prednisone, but her bronchial cultures were negative, pulmonary function studies were within normal limits, and she continued to smoke throughout the period.  Tr. 15-16.  She had ankle pain in April 2012 but records did not document additional complaints or treatment.  Tr. 16.  In May 2012 she appeared well and had full range of motion in her shoulders and no elbow or knee pain.  Tr. 16.  She had psoriasis on her fingers and right foot.  Tr. 16.  X-rays of her hands were normal.  Tr. 16.  In October 2012 she reported doing well on methotrexate.  Tr. 16.  She had had "at least 3 episodes" of sarcoidosis since 1994.  Tr. 16.  In other words, Nelson had relatively unremarkable exam findings, negative diagnostic results, responded to treatment (and at least once acted contrary to recommendation and treatment), and did not regularly pursue treatment.

The ALJ also described that Nelson's records showed that she performed activities consistent with sedentary work.  Tr. 16.  In June 2009 she was self-employed as an artist.  Tr. 16.  In July 2010 she reported watching her boyfriend's three children (at that time, aged 6, 8 and 10) on a regular basis while also still working with stained glass.  Tr. 16.  She continued to make

stained glass in August 2011.  Tr. 16.  In October 2012 she reported taking care of her boyfriend's three children, at that time aged 8, 10 and 12.  Tr. 16.  Nelson reported a worsening of her condition in June 2013 on her disability report: her sarcoidosis returned and she had pain in her joints, nodules on her shins, depression, fatigue, and spent time in bed.  Tr. 16.  However, the ALJ accurately observed that this alleged worsening occurred after her date last insured.  Tr. 16.  Nelson does not dispute this finding.  Importantly, the only record evidence she relies upon in her briefs is from 2014 and 2015, almost two years after her date last insured.  Doc. 14, p. 4.

Finally, despite all Nelson's complaints about the ALJ not adopting the state agency reviewing physicians' RFC assessment, the fact remains that the VE testified at the hearing that an individual with the RFC assessed by the state agency reviewers could perform work as a cleaner, housekeeper, sales attendant, and router, i.e., jobs that exist in substantial numbers in the national economy.  Tr. 50-51.

Nelson also argues that the ALJ erred because he did not perform a "function-by-function" analysis "as envisioned by SSR 96-8p."  Doc. 14, p. 9-10.  SSR 96-8p requires that an ALJ evaluate a claimant's RFC "function-by-function"; it does not require that an ALJ discuss this function-by-function evaluation in writing.  *See Delgado v. Comm'r of Soc. Sec*., 30 Fed. Appx. 542, 547 (6th Cir. 2002) ("Although SSR 96–8p requires a "function-by-function evaluation" to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged," collecting cases).

In sum, the ALJ explained that the record supports a finding that Nelson can perform a full range of sedentary work and this is supported by substantial evidence.  Therefore, the Commissioner's decision must be affirmed.  *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477

(6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports

the ALJ's conclusion).

### VIII. Conclusion and Recommendation

For the reasons set forth herein, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.


Dated: July 19, 2017

_____
Kathleen B. Burke
United States Magistrate Judge



### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).